**COMMUNITY NUTRITION INSTITUTE, et al., Petitioners,**

v.

**Dr. Frank YOUNG, Commissioner, Food and Drug Administration, Respondent,**

**G.D. Searle & Co., Intervenor.**

**COMMUNITY NUTRITION INSTITUTE, et al., Appellants,**

v.

**Dr. Frank YOUNG, Commissioner, Food and Drug Administration, Appellee.**

Nos. 84–1153, 84–5253.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 25, 1985.

Decided Sept. 24, 1985.

---

James S. Turner, Washington, D.C., for petitioners/appellants.

David A. Levitt, Atty., Dept. of Justice, Washington, D.C., with whom J. Patrick Glynn, Director, Office of Consumer Litigation, Dept. of Justice, and Thomas Scarlett, Chief Counsel, Food and Drug Admin., Washington, D.C., were on the brief, for respondent/appellee.

James R. Phelps and Robert A. Dormer, Washington, D.C., were on the brief for intervenor G.D. Searle & Co.

Before MIKVA, EDWARDS and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

These consolidated cases arose out of the Food and Drug Administration's ("FDA" or the "agency") approval, without a public hearing, of the food additive aspartame for use in liquids. Aspartame is an artificial sweetener more commonly known as Nutra-Sweet, when used as a food additive, or as Equal, when used as a tabletop sweetener.

The underlying issue here is the FDA's action in approving the use of aspartame in liquids. Case No. 84–5253 is an appeal from the District Court's dismissal of a claim seeking to compel the FDA to conduct a hearing on aspartame, as well as a

request to stay the approval pending the hearing, for lack of jurisdiction. In case No. 84–1153, we review the FDA's regulation approving the use of aspartame in liquids. For the reasons discussed below, we affirm the decisions of both the District Court and the FDA.

## I. BACKGROUND

Aspartame, a combination of two amino acids, phenylalanine and aspartic acid, was discovered and formulated by G.D. Searle & Co. ("Searle"), intervenor in this case, in the early 1970's. Because aspartame is approximately 180 times as sweet as sugar, it is an effective sugar substitute for those who wish to reduce their caloric intake or who must limit their consumption of sugar. Since the FDA issued its approval, aspartame is used in nearly all major brands of diet soft drinks, either in a blend with saccharin or as the sole sweetener ("wet use"). Aspartame is also used as a sweetener in a variety of non-carbonated beverage mixes and foods ("dry use"). We note that the dry use of aspartame, previously approved by the FDA, see 39 Fed.Reg. 27317 (July 26, 1974), is not on appeal here. While the proceedings surrounding the approval for dry use are helpful to our analysis of the instant appeal, we review here only the actions of the FDA and the District Court concerning the wet use of aspartame.

### A. Approval for Dry Use

In March 1973, Searle filed a petition with the FDA for the approval of aspartame for use in certain dry foods such as powdered beverages, desserts and dessert toppings, and chewing gum as well as for use as a tabletop sweetener ("dry use"). 38 Fed.Reg. 5921 (Mar. 5, 1973). In July 1974, aspartame was approved for the requested dry uses, provided that two warning notices appear on products containing aspartame. 39 Fed.Reg. 27317 (July 26, 1974). The first warning is: "Phenylketonurics: Contains Phenylalanine." 21 C.F.R. § 172.804(e)(2). This warning is necessary because a high plasma level of phenylala-

nine is associated with mental retardation in a small number of individuals with a genetic disorder that results in a lessened ability to metabolize phenylalanine. The second required statement cautions that aspartame for table use is not to be used in cooking or baking. 21 C.F.R. § 172.-804(e)(3).

Two parties lodged objections to aspartame's dry use with the FDA. Dr. John Olney ("Olney") contended that the aspartic acid moiety of aspartame could cause brain lesions and neuroendocrine disorders in animals; therefore, according to Olney, aspartame posed a risk to human infants and children. 46 Fed.Reg. at 38285. James F. Turner, Esq. ("Turner"), who is counsel for petitioners in the instant cases, contended that phenylalanine moiety might lead to mental retardation. Id. Neither Olney nor Turner (collectively, the "objectors") are parties to the instant proceeding. The FDA granted the objectors' request for a hearing. Subsequently, the objectors and the FDA agreed to substitute a three member Public Board of Inquiry (the "Board") for the traditional hearing conducted by an Administrative Law Judge, as permitted by FDA regulations. See 21 C.F.R. Part 13. The Board was chosen by the FDA from a list of nominees submitted by the objectors. 46 Fed.Reg. 38286.

Before the hearing was convened, the FDA received reports that raised serious questions about the safety of aspartame and the methods by which it had been tested. In 1974, Searle submitted to the FDA a report of a study in which rats fed a principal degradation product of aspartame, called diketopiperazine ("DKP"), developed uterine polyps. Four teams of pathologists, including an FDA team, investigated the results to determine if the polyps revealed a safety hazard in connection with the consumption of aspartame. In addition, an FDA inspector filed reports that were critical of Searle lab practices, raising doubts as to the authenticity of Searle's reported data. An investigative task force appointed by the FDA found extensive problems with the quality and reliability of

Searle's research practices and test results relating to aspartame as well as to seven other products. The task force reported that the Searle research practices were so severely flawed that the test results were unreliable. As a result, in December 1975, the FDA stayed its approval of aspartame for dry use, *see* 40 Fed.Reg. 56907 (Dec. 5, 1975), and delayed convening the Board until Searle's aspartame safety studies could be audited.

Following the stay, fifteen of the Searle studies were selected for an audit as to authenticity, *i.e.*, that the tests and their results were neither faked nor misrepresented. The audit did not address the planning or execution of the studies or the correctness and meaning of the conclusions to be drawn from the studies. Twelve studies were audited by Universities Associated for Research and Education in Pathology (UAREP), a non-profit consortium of university pathologists. 46 Fed.Reg. at 38286. UAREP's inquiry was limited to "the question of whether the experiments were carried out according to protocol plans and the accuracy and reliability with which the experiments were performed and reported to FDA." *Id.* at 38302. The FDA reviewed the remaining three studies and found them to be authentic. In addition, the FDA examined UAREP's report and found that the test results described were authentic.

The Board was convened in January 1980. During three days of public hearings, the Board considered the following questions:

1. [W]hether the ingestion of aspartame, either alone or together with glutamate, poses a risk of contributing to mental retardation, brain damage, or undesirable effects on neuroendocrine regulatory systems[.]

2. [W]hether the ingestion of aspartame may induce brain neoplasms (tumors) in the rat[.]

3. Based on answers to the above questions,

(a) Should aspartame be allowed for use in foods, or, instead should approval of aspartame be withdrawn?

(b) If aspartame is allowed for use in foods, *i.e.*, if its approval is not withdrawn, what conditions of use and labeling and label statements should be required, if any?

44 Fed.Reg. at 31717. At the close of the hearings, the Board recommended that approval of aspartame be withdrawn until further study to establish whether or not a relationship existed between the ingestion of aspartame and brain tumors. As a result of this recommendation, the Board did not respond to the labeling question. The Board did agree with the FDA's determination that aspartame posed no risk of causing brain damage or endocrine dysfunction in people who used it. 46 Fed.Reg. 38288–89.

All parties to the Board's proceedings filed exceptions to its decision pursuant to 21 C.F.R. § 12.125. On July 24, 1981, the FDA issued a final decision, concurring with the Board's finding that aspartame would cause no brain damage or endocrine dysfunction, but overruling the Board's conclusion regarding brain tumors. Consequently, the FDA's decision reinstated approval of aspartame for dry use. 46 Fed. Reg. 38285. None of the parties to the proceeding appealed the FDA's decision to the Court of Appeals.

B. *Approval for Wet Use*

In October 1982, Searle filed a petition to amend the aspartame food additive regulation to include the wet use of aspartame. 47 Fed.Reg. 46140. The petition referenced, *inter alia*, the scientific data contained in the petition for approval of dry use. 48 Fed.Reg. at 31378. In July 1984, the FDA issued a final rule permitting aspartame to be used in carbonated beverages and carbonated beverage syrup bases. *Id.* at 31376 (July 8, 1983) (amending 21 C.F.R. § 172.804 by adding § 172.804(c)(6)).

On August 8, 1983, the Community Nutrition Institute ("CNI"), Woodrow C. Monte, Ph.D. ("Monte") and Turner filed

objections to the rule, and requested both a stay and a public hearing. The FDA denied the request for the stay. 48 Fed.Reg. 52899 (Nov. 16, 1983). On December 9, 1983, the Arizona Dietetic Association ("Arizona") and the Central Arizona District Dietetic Association ("Central") filed a Joinder of Petition, indicating they too objected to the rule. (We refer, hereafter, to these five individuals or organizations as "Appellants.") Also on December 9, Monte filed a supplement to his objections. On February 17, 1984, the FDA denied their objections and requests for a hearing on the ground that the objections failed to raise any genuine or substantial issue of fact. 49 Fed.Reg. 6672 (Feb. 17, 1984). On April 17, 1984, four of the objectors filed a petition for review of the FDA's denial of the hearing and interim stay. We review the actions of the FDA in Section III below.

## C. *District Court Proceedings*

On December 23, 1983, while the request for a hearing was still pending before the FDA, the appellants also filed suit in District Court seeking an order requiring the FDA to hold a hearing and to stay the regulation until the hearing was completed. Thereafter, on January 24, 1984, the appellants filed a motion to stay the effective date of the approval of aspartame for both wet and dry use. The basis for the motion was a series of consumer complaints regarding adverse health effects caused by aspartame as well as new evidence from medical researchers calling into question the safety of aspartame. After a hearing, the District Court denied the motion, finding that appellants' evidence was "anecdotal, unsubstantiated by direct scientific evidence and contains much that is hearsay." *Order*, Jan. 27, 1984.

On February 15, 1984, the appellants again filed a motion for a temporary restraining order supported by additional consumer complaints, affidavits describing issues that had been raised and considered by the Board in the dry use proceeding, and three letters from medical researchers commenting on various aspects of aspartame. In response to this second motion for a stay, the FDA filed a motion to dismiss, asserting that the district court lacked jurisdiction since judicial review of agency action or inaction was appropriate only in the Court of Appeals. The FDA also filed an Opposition accompanied by supporting affidavits, explaining that the FDA had reviewed the data provided by the appellants, but had found no pattern of complaints that would indicate that aspartame was unsafe.

Two days later, on February 17, 1984, the FDA denied the objectors' request for a hearing. Thereafter, on March 22, 1984, the District Court, 583 F.Supp. 294, denied the second motion for a temporary restraining order and granted FDA's motion to dismiss the complaint on the ground that jurisdiction was lacking. The District Court concluded that since the "FDA [had] entered a final ruling on plaintiffs' request for an oral hearing and denied the hearings sought by the plaintiffs," only the Court of Appeals had jurisdiction. *See* Memorandum Order of Dismissal at 2.

## II. THE DISTRICT COURT CASE: JURISDICTION

At issue in Case No. 84–5253 is whether the District Court erred in determining that it lacked jurisdiction once the FDA rejected Appellants' request for a hearing. In spite of the Food, Drug & Cosmetic Act's commitment to exclusive review in the Court of Appeals of final agency orders, appellants contend that policy dictates permit the District Court to retain jurisdiction over a case even where the predicate for jurisdiction, here the lack of a final order, has evaporated. The policies underlying Appellants' argument are that first, a contrary holding would permit an agency to delay review by simply withholding final action until just before a district court holds a hearing; under this scenario, the FDA could lengthen the time for review of its action by the amount of time it takes to file in the District Court and obtain a hearing. Second, appellant argues that where there is no record to review, it is appropriate for a

district court to have review in the first instance in order to develop the record.

 We agree that the District Court did not have jurisdiction to review what had become a final order; by statute, such jurisdiction lies exclusively in the Court of Appeals. However, we find that the District Court erred in asserting jurisdiction over the case even before the FDA issued a final order; the FDA's ruling had no effect on the District Court's jurisdiction. Under the law of this circuit, the District Court *never* had jurisdiction over the agency's delay in ruling on the request for a hearing, neither before nor after the FDA denied the hearing request.

The question of where jurisdiction lies over interlocutory appeals from agency action (or inaction) has occasioned some anomalous results in the past. *Compare, e.g., Association of Nat'l Advertisers v. FTC,* 627 F.2d 1151, 1157 (D.C.Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980) (District Court had general federal question jurisdiction under 28 U.S.C. § 1331 over nonfrivolous constitutional claims of agency bias and prejudgment); *Public Citizen Health Research Group v. Commissioner, Food & Drug Administration,* 740 F.2d 21, 34–35 (D.C. Cir.1984) (original jurisdiction of District Court not questioned, Court of Appeals remands to District Court for further evidence) *with Potomac Electric Power Co. v. ICC,* 702 F.2d 1026, 1032–33 (D.C.Cir.1983) (initially brought in Court of Appeals, jurisdiction upheld); *MCI Telecommunications Corp. v. FCC,* 627 F.2d 322 (D.C.Cir.1980) (same). These inconsistent results signaled the need for close examination of the question of jurisdiction over interlocutory appeals. *See Telecommunications Research and Action Center v. FCC ("TRAC"),* 750 F.2d 70 (D.C.Cir.1984).

In *TRAC,* this court fully resolved the issue, holding that

> Because the statutory obligation of a Court of Appeals to review on the merits may [pursuant to the All Writs Act] be defeated by an agency that fails to resolve disputes, a Circuit Court may re-

solve claims of unreasonable delay in order to protect its future jurisdiction. 750 F.2d at 76 (citations omitted). The jurisdiction to review agency inaction lies exclusively in this court. *Id.* at 77. We affirm the District Court's dismissal of the request for the hearing because that case could be heard only in this court.

Although jurisdiction over claims of non-final agency action or of agency inaction lies in this court, we exercise this jurisdiction reluctantly. Mandamus is an extraordinary remedy; we require similarly extraordinary circumstances to be present before we will interfere with an ongoing agency process. In assessing claims of agency delay, we are guided by a "rule of reason." 750 F.2d at 80. While there is no absolute definition of what is a reasonable time, we know that it may encompass "months, occasionally a year or two, but not several years or a decade." *See MCI Communications Corp. v. FCC,* 627 F.2d 322, 340 (D.C.Cir.1980). In the past, unreasonable delays have been found where the agency had not acted in six years, *see Abbott Laboratories v. Harris,* 481 F.Supp. 74, 76–77 (N.D.Ill.1979), and after eight years, *see Potomac Electric Power Co. v. ICC,* 702 F.2d at 1033–35.

 The delay complained of in the instant case was five months. Our precedents suggest that this is not an unreasonable delay. In addition, we note that the FDA's procedures, designed to be thorough and well-reasoned, do not permit quick decisions. A request for a hearing requires the agency to examine the record closely, because hearings are appropriate only where material objections to the FDA's actions exist. *See Pineapple Growers Ass'n v. FDA,* 673 F.2d 1083, 1085 (9th Cir.1982); *Pactra Industries v. Consumer Product Safety Comm'n,* 555 F.2d 677, 684 (9th Cir.1977); *Dyestuff and Chemicals, Inc. v. Flemming,* 271 F.2d 281, 286 (8th Cir. 1959), *cert. denied,* 362 U.S. 911, 80 S.Ct. 681, 4 L.Ed.2d 619 (1960). Requests for hearings must be accompanied by objections "specifying with particularity the provisions of the order deemed objectionable,

stating reasonable grounds therefor." 21 U.S.C. § 348(f) (1982). The FDA has promulgated regulations that require the FDA to take a hard look at the objections. *See* 21 C.F.R. § 12.24(b)(1)–(3). While the FDA's denial of the hearing obviates our need to assess whether the instant case meets the mandamus standard, we could not say that a period of five months to accomplish the statutory mandate approached an "excessive" period.

■ In addition to a ruling on the request for a hearing, Appellants also sought a stay of the effective date of the rules approving both wet and dry use of aspartame until the hearing was held. Appellants argue that the District Court's jurisdiction over the stay continues even after the FDA issued its denial of the request for a hearing. As with the request for a hearing, we find that the District Court never had jurisdiction over the request for a stay. Stays of administrative action are properly sought in this court under a writ of mandamus. *See In re GTE Service Corp.*, 762 F.2d 1024, 1026 (D.C.Cir.1985). The exclusive grant of jurisdiction to the Court of Appeals means that mandamus to obtain a stay also is available only in this court. *See TRAC*, 750 F.2d at 78–79. Accordingly, we affirm the judgment of the District Court dismissing the request for a stay for want of jurisdiction.

### III. THE FDA CASE

At issue in Case No. 84–1153 is whether the FDA acted within its discretion under the Food, Drug, and Cosmetic Act in denying Appellants a hearing on the possible dangers of aspartame in carbonated soft drinks and other "wet" uses. Under 21 U.S.C. § 348(g)(1), any person adversely affected by the FDA's denial of a hearing request may, within sixty days, petition for review of the denial in the Court of Appeals. The Commissioner denied Appellants' request for a hearing on February 22, 1984, 49 Fed.Reg. 6672, and they filed a petition for review of the FDA's denial of a hearing in this court on April 17, 1984. Because Appellants have filed a timely petition for review, their appeal is properly before us. Appellants contend that the Food, Drug & Cosmetic Act mandates a hearing when any interested party objects to the FDA's approval of a food additive as safe for a particular use. Appellants also argue that, even if an interested party is only entitled to a hearing upon a showing that a material issue of fact exists, they have met that burden.

■ We find that the FDA did not exceed its lawful discretion in denying a hearing to Appellants after the agency reviewed the record. The appellants raised no material objections to the safety of aspartame that would require the FDA to grant a hearing. Our review of the agency's action is limited to an evaluation of whether it has given adequate consideration to all relevant evidence on the record. We conclude that the FDA properly denied a hearing after finding that petitioners have raised no material issue regarding the safety of the wet use of aspartame.

■ At the outset it is essential to distinguish the proper subject matter of our review of the agency's action from the scope or intensity of our review. Our delineation of the proper subject matter is determined by the procedural history of the FDA's aspartame approval proceedings. Appellants raise a number of objections to the safety of the artificial sweetener. However, some of these objections overlap with or are identical to challenges to the safety of aspartame that the FDA has already considered and rejected when it approved aspartame for dry use. These issues may not be reopened. Since the only issue here is whether the FDA properly denied a hearing on the liquid uses of aspartame, only that evidence which bears on the dangers arising specifically from wet use is relevant to the FDA's determination that no material issues of fact existed. The agency's conclusions concerning the safety of the dry use of aspartame, except to the extent that new evidence suggests that the FDA may not rely on these prior findings in its deliberations on wet use, may not be raised again in this proceeding in the interests of

administrative finality and judicial economy. *See Costle v. Pacific Legal Foundation,* 445 U.S. 198, 213, 217, 100 S.Ct. 1095, 1104, 1106, 63 L.Ed.2d 329 (1980) (EPA permitted to condition an adjudicatory hearing, after its decision to extend a permit, on "identification of a disputed issue of fact by an interested party"); *Cooper Laboratories, Inc. v. Commissioner, Federal Food and Drug Administration,* 501 F.2d 772 (D.C.Cir.1974). Thus we separate out those issues and that evidence which bear on the safety of wet use from the questions and data that were necessarily decided when the agency approved aspartame for dry use. The appellants may not now bring these dry issues before the FDA as reasons to require a hearing.

■ Having limited the issues which the FDA was required to consider before denying a hearing to Appellants, we next turn to the standard of review to apply in determining whether the FDA's denial of a hearing on that evidence constituted an abuse of agency discretion. Our scope of review, the exactitude of the fit that we require between the agency's conclusions and the germane facts it investigated, is necessarily deferential. The judiciary is ill-equipped to conduct investigations and analyze facts of the type involved in this case. Because of the agency's expertise and broad discretion in ensuring the safety of food additives, we cannot substitute our judgment for the agency's. The Commission's finding that there were no material issues of fact can be overturned only if an examination of the record discloses that material issues of fact are apparent to any reasonable examiner. *Smith-Kline Corp. v. Food and Drug Administration,* 587 F.2d 1107, 1119 (D.C.Cir.1978) (record must disclose genuine issue of fact to be resolved in order for court to order hearings); *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971) (judicial review of agency's denial of hearing request need only "assure that the agency has given learned consideration to all the material facts and issues"). Mere differences in the weight or credence given to particular scientific studies, or in the numerical estimates of the average daily intake levels of aspartame, are insufficient. The court will not substitute its judgment on highly technical and factual matters for that of the agency charged with the supervision of the industry. *See Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

A. *The Statutory Provision for a Hearing*

■ Under such limited scope of review and a delineation of the issues upon which the review must be focused, we conclude that Appellants have failed to demonstrate that the FDA abused its discretion by denying a hearing. The FDA's decision to approve a food additive is governed by Section 409 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 348. Under this statute, a new food additive is to be approved if a "fair evaluation" of the data indicates the safety of the ingredient. *Id.* at § 348(c)(3). FDA has interpreted "safety" to mean "that there is a reasonable certainty in the minds of competent scientists that the substance is not harmful under the intended conditions of use." 21 C.F.R. § 170.3(i). Appellants argue that the Act mandates a nondiscretionary grant of a hearing by the FDA upon the objection of an interested party. That is not what the statute says. A hearing is only available if petitioners raise a material issue in their objections. The statute provides that any person adversely affected by the approval or rejection of a food additive petition may within thirty days of the order file objections and request a hearing. 21 U.S.C. § 348(f)(1). However, the statute requires that the objections specify with particularity the provisions of the order deemed objectionable and state reasonable grounds for the objections. The Secretary shall hold such hearing *for the purpose of receiving evidence relevant and material to the issues raised by such objections.* If the agency determines that no hearing is necessary, the regulation approving the food additive becomes final.

■ It is well established that the statutory grant of a public hearing is not absolute. A request for a hearing must contain evidence that raises a material issue of fact on which a meaningful hearing might be held. *Pineapple Growers Ass'n v. FDA,* 673 F.2d 1083, 1085 (9th Cir.1982). In addition, the issue of fact raised by the objecting party must go to the legality of the agency's order. *Id.* at 1085, quoting *Dyestuffs and Chemicals v. Flemming,* 271 F.2d 281, 286 (8th Cir.1959), *cert. denied,* 362 U.S. 911, 80 S.Ct. 681, 4 L.Ed.2d 619 (1960) ("Where the objections stated and issues raised thereby are, even if true, legally insufficient, their effect is a nullity and no objections have been stated.") The FDA's own regulations reflect this requirement that a challenge to an agency's factual conclusion must present a live controversy and affect the legality of the agency's determination to act in a certain way. *See Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 620–22, 93 S.Ct. 2469, 2478–79, 37 L.Ed.2d 207 (1973). In 21 C.F.R. § 12.24(b), the FDA requires that a person seeking to justify a hearing on objections to approval of a food additive must show 1) the existence of a genuine and substantial issue of fact to be resolved at a hearing; 2) that the factual issue can be resolved by available reliable evidence; 3) the objecting party's data and information, if proved, would be sufficient to resolve the factual issue in the way sought by the objecting party; and 4) resolution of the factual issue in that way would suffice to warrant the relief requested. If the objecting party fails to make these threshold showings, the FDA denies the hearing request.

**B.** *The FDA's Examination of the Evidence of the Dangers of Aspartame for Wet Use*

As pointed out above, Appellants may obtain a hearing on issues decided during the approval of aspartame for dry use only if they introduced new evidence suggesting that reliance on those issues in the context of wet use is erroneous. Appellants contend that they have introduced this new evidence on the questions of: 1) the relationship between the ingestion of aspartame and brain lesions, mental retardation, and mental instability; 2) the availability of new and more sophisticated tests for the formation of the toxic chemical nitrosamine as a result of aspartame ingestion; 3) the increase in average daily consumption of aspartame resulting from its use in carbonated beverages; 4) the carcinogenicity of aspartame; and 5) the labeling requirements for aspartame. Our review of each of these contentions leads us to conclude that Appellants have not introduced any new evidence suggesting that the FDA, in its approval of aspartame for wet use, abused its discretion in relying on tests and studies conducted previously in connection with the effects of consuming aspartame in dry uses.

1. *Brain Damage.* Appellants argue that there is a material issue of fact on whether the approval of aspartame for carbonated beverage use would increase the level of phenylalanine in blood plasma, which would in turn cause changes in the production of the brain's neurotransmitters. Petitioners then speculate that these changes might lead to aberrations in behavior. In support of this argument, Appellants cite letters from Dr. Richard Wurtman to the director of the Bureau of Foods at the FDA. Two effects concerned Dr. Wurtman. First, his data indicated that large doses of aspartame given to humans and rats after they had been deprived of food increased the concentration of two amino acids, phenylalanine and tyrosine, which control production of two brain neurotransmitters, norephinephrine and dopamine. However, Dr. Wurtman did not demonstrate that these biochemical changes produced behavioral changes in humans or animals. In addition, another study, cited by the FDA in the preamble to the carbonated beverage approval, 48 Fed. Reg. 31379, found that high doses of aspartame did not significantly influence the amounts of either neurotransmitter in the brains of the subjects. Second, Dr. Wurtman was concerned that aspartame would

interfere with the production of another neurotransmitter, serotonin, that normally occurred when sated rats were fed large amounts of carbohydrates. Dr. Wurtman asserted that aspartame's effect on neurochemical activity in the brain had previously been estimated without consideration of the effect of carbohydrates. Dr. Wurtman maintained that aspartame's effects could be "markedly amplified" when the sweetener was ingested with carbohydrates that consumers probably would consume at the same time as carbonated soft drinks. However, Dr. Wurtman failed to provide empirical support for his hypothesis that aspartame interferes with carbohydrates' usual effect of inducing serotonin production. The Commissioner evaluated this study, and concluded that the agency had fully evaluated all the issues about the safe use of aspartame in carbonated beverages.

Appellants also cite an assertion by Dr. Paul LeChance that the increased use of aspartame resulting from the addition to carbonated beverages may result in a narrowed "margin of safety between what could be labeled psychological levels of amino acids in a population known to consume high protein diets, and pharmacological levels with the possibility of exerting excitatory [sic] over time, and possible brain lesions...." The FDA concluded that "an adequate margin of safety exists between the levels of phenylalanine [a component of aspartame] known to produce mental retardation and those resulting even from exaggerated exposure to aspartame in carbonated beverages." 49 Fed. Reg. 6674.

2. *Nitrosamines.* Nitrosamines, believed to be carcinogenic, are compounds that theoretically might result from the breakdown of aspartame and of diketopiperazine (DKP), a breakdown product of aspartame. The agency, however, basing its findings on Searle experiments which attempted to create nitrosamines under ideal laboratory conditions, concluded that "stable nitrosamines were extremely difficult to form," and that "any amounts that could be formed were extremely unstable under conditions that would occur in the gastrointestinal system." *Id.* at 6674, 6677. Appellants have argued that the FDA should reopen the search for carcinogenic nitrosamines, citing the emergence of new analytical techniques since 1974 that enabled investigators to detect nitrosamine in malt beverages. We conclude that the FDA acted well within its discretion in concluding, based upon its expert review of the record, that Appellants offered no evidence that the "formation of nitrosamines in malt beverages has any possible relevance to structurally dissimilar nitrosamine formation in soft drinks containing aspartame." *Id.* at 6677. Absent proof by Appellants that new scientific procedures were relevant to beverages containing aspartame, FDA could as a matter of policy decide against requiring additional testing without holding a hearing on the issue.

3. *Increased Consumption.* Appellants maintain that the FDA's previous estimates of daily aspartame consumption, which formed the basis for its conclusion that dry use of aspartame was safe, cannot form the basis for approval of aspartame in wet uses without a hearing. The premise of Appellants' argument is that wet use will increase the overall average consumption of aspartame. Our review of the record convinces us that the FDA gave proper consideration to the effect of liquid use on overall consumption in concluding that the public would not be exposed to danger. In its hearing on dry use of aspartame, the Public Board of Inquiry used the consumption estimate of 34 mg of aspartame/kilogram (mg/kg) of body weight as the 99th percentile of estimated daily consumption for all age groups. 46 Fed.Reg. 38289–90. This estimate means that only one percent of those who consume aspartame would consume more than 34 mg/kg a day, while the vast majority of consumers would have lower consumption levels. Significantly, this 34 mg/kg figure was based on the assumption that aspartame would be used in the foods sought for approval in the dry use petition, in a number of other foods, and as the *only sweetener* in all carbonated beverages. *Id.* at 38285, 38290.

The FDA also projected that an average daily intake of 50 mg/kg of body weight would be safe. 49 Fed.Reg. 6672, 6677, 6679. Since the FDA observed that the "no effect" dose for aspartame (the highest level at which no toxic effects on experimental animals were observed) was between 2000 and 4000 mg/kg of body weight, the agency concluded that a 50 mg/kg intake body weight was safe. The safety factor, between forty-fold and eighty-fold, provides a conservative safety margin; it indicates that the average daily consumption could be multiplied by that factor without exceeding the "no effect dose" of aspartame. *Id.* at 6677–78. Appellants also allege that some patterns of consumption of carbonated beverages—for example, drinking several cans in rapid succession on a hot day—would lead to higher concentrations of aspartame. The FDA acknowledged that some consumers may exceed 34 mg/kg of aspartame on some days, particularly consumers in hot weather or consumers, such as children, who have low body weight. 49 Fed.Reg. 6678. The agency, however, noted that studies conducted by Searle Laboratories, intervenors/respondents in this case, indicated that even levels of 200 mg/kg of body weight in a single dose did not produce acute toxicity. This concentration is the level that would result from a normal adult's consumption of 5.5 pounds of sugar or 13 quarts of orange soda containing aspartame in a single sitting. 48 Fed.Reg. 31380; 49 Fed.Reg. 6676. The FDA could properly exercise its discretion in deciding that "the pattern of aspartame ingestion over the day is not important as long as the total amount ingested per day does not exceed the 200 mg/kg level shown to be safe." 49 Fed.Reg. at 6678. We find no reason to disturb this conclusion.

4. *Carcinogenicity.* Appellants attempt to reopen the issue of the carcinogenicity of aspartame and its breakdown products. Although the Commissioner concluded, based on the dry use proceeding, that aspartame had not been shown to cause cancer, *Id.* at 6672, 6679–80, Appellants challenge this conclusion by attacking one of the studies that provided support for the Commissioner's conclusions. No party contested the agency's reliance on the study during the dry use proceeding. Nor do Appellants point to specific deficiencies in the study which have come to light since the time for appeal expired. We find that Appellants have failed to create a material issue on the carcinogenicity of aspartame that the agency overlooked in its decision to deny a hearing in this case.

5. *Labeling Requirements.* Appellants assert that the conditions of use and required labeling statements for aspartame in liquid use are new issues that the Public Board of Inquiry did not address. The Board and the FDA, however, have considered the issue of appropriate warnings. The Board required a caution to patients with phenylketonuria that aspartame contained phenylalanine. In addition, the Commissioner's dry use approval in 1981 required a statement on the label that aspartame, when packaged as a tabletop sweetener, should not be used in cooking or baking. 21 C.F.R. § 172.804(e)(3). Appellants' current objections do not present any new evidence or suggest any material issue of fact about the necessity of additional warning or labeling requirements.

Appellants also raise a number of issues which they maintain are unique to wet use and therefore were properly excluded from the dry use studies. Specifically, Appellants claim that wet use of aspartame 1) has a toxic effect on human embryos; and 2) decomposes at higher temperatures in a more dangerous way than aspartame carried in dry mediums. We find no evidence on either of these points that would require the FDA to hold a hearing.

1. *Danger to Fetuses.* Diketopiperazine (DKP) is the principal degradation product of aspartame. Seeking to prove the embryotoxic effects of DKP, Appellants advance a letter from Dr. Jean Lederer, reporting on his administration of DKP to rats. The FDA weighed this evidence, and concluded that aspartame and its breakdown products did not produce fetal damage. 49 Fed.Reg. 6682. Dr. Lederer

could not associate fetal damage with aspartame, 48 Fed.Reg. 31380. In its approval of July 8, 1983, the FDA concluded from Dr. Lederer's report, "Aspartame and its Effect on Gestation in the Rat," that animals fed at the highest level of DKP in the diet showed no embryotoxic effects.

2. *Decomposition.* Appellants argue that the use of aspartame in carbonated beverages is qualitatively different from its use in dry foods. They base this argument on the claim that carbonated liquid is peculiarly susceptible to changes of temperature and quality of the medium that lead to the breakdown of a large amount of the aspartame present in the liquid. In addition, Dr. LeChance asserted that the presence of carbonated beverages in distribution channels in "subtropical temperature conditions" during the summer months would lead to "deterioration of DKP and release of the free amino acids...." It was within the FDA's discretion to conclude, based on its expert review of the evidence, that no safety issues respecting aspartame's instability at high temperatures warranted a hearing. 48 Fed.Reg. 31376–77, 31381.

We conclude that Appellants have failed to raise any material issues of fact requiring the FDA to grant a hearing. Therefore, we affirm the FDA's decision in Case No. 84–1153 to deny Appellants a hearing on the wet use of aspartame. In Case No. 84–5253, we affirm the District Court's dismissal for lack of jurisdiction of Appellants' request for a stay of approval pending the hearing.

*It is so ordered.*