999 F.Supp. 1289 (1998)
TRUTH IN LABELING CAMPAIGN, et al., Plaintiffs,
v.
Donna SHALALA, et al., Defendants.
No. 4:95CV1633 TCM.
United States District Court, E.D. Missouri, Eastern Division.
March 30, 1998.
*1290 Alan K. Goldstein, Gary Sacks of Goldstein and Price, St. Louis, MO, for Plaintiffs.
Wesley D. Wedemeyer, Asst. U.S. Atty., St. Louis, MO, Kelly S. Terry, U.S. Dept. of Justice, Office of Comsumer Litigation, Washington, DC, Louisa T. Nickerson, U.S. Food and Drug Administration, Rockville, MD, for Defendants.

MEMORANDUM AND ORDER
MUMMERT, United States Magistrate Judge.
This case has its origins in a dispute about the labeling requirements for monosodium glutamate ("MSG"). Pending before the Court[1] are the parties's cross-motions for summary judgment. [Docs. 64, 69.]

Background

Procedural History
Current regulations of the Federal Food and Drug Administration ("FDA") require that MSG be identified on a food label when MSG is added to the food in its single ingredient form. See 21 C.F.R. § 101.22(h)(5).[2] A citizen's petition challenging this regulation was filed on December 31, 1994, pursuant to 21 C.F.R. § 10.30(e)(2). (R-3 at X000001-19.)[3] The petition was filed on behalf of 23 individuals who contended that § 101.22(h)(5) was "totally inadequate to warn MSG-sensitive consumers of the unnamed presence of dangerous MSG in manufactured or processed foods." (Id. at X000010.) This inadequacy resulted from the FDA's distinction between MSG in its single ingredient form and MSG as a component of foods. (Id.) Present regulations, specifically 21 C.F. R. § 101.22(h)(7),[4] require only that MSG in its latter form be identified *1291 on food labels as "flavor," "flavor enhancer," "flavoring," "hydrolyzed corn protein," or in similar terms. (Id.) The petitioners sought the disclosure of the presence and amount of MSG in end products of all manufactured or processed food, regardless of whether MSG was added in its single ingredient form or as a component of another food product. (Id. at X000012.) The disclosure was to be designated as 21 C.F.R. § 101.23 and was to read, in pertinent part, as follows:
(a) Any free glutamic acid present in a finished manufactured or processed food shall be declared on the label of such food as "MSG." The amount shall be expressed on the label in grams, per the total grams in the package or container, and grams per serving, to the nearest thousandth of a gram of free glutamic acid present. The free glutamic acid, or MSG, shall be clearly and conspicuously declared on the label as follows: "Contains ___ grams free glutamic acid (MSG) and ___ grams per serving."
The petitioners also wanted a warning on the label of every manufactured or processed food containing MSG. (Id.)
After the citizens' petition had been pending for more than 180 days, the instant cause of action was filed by Truth in Labeling Campaign ("TILC") and 30 individuals (hereinafter collectively referred to as "Plaintiffs").[5] Plaintiffs first allege that the present MSG regulations are misleading and deceptive, in violation of 21 U.S.C. §§ 321(n)[6] and 343(a),[7] and second, that the FDA acted arbitrarily and capriciously in enacting and administering those regulations.[8] (Comp. at ¶¶ 56, 57, 62-66 .) Plaintiffs seek declaratory and injunctive relief.
The citizens' petition was denied on December 31, 1996. (R-3 at 1081-94.) On September 12, 1996, the FDA published a notice of proposed rulemaking for requirements for label information on the free glutamate content of foods. (Def.'s Ex. "A" at [2].)

Monosodium Glutamate
Glutamate is a salt form of animo acid, J.E. Schmidt, Attorney's Textbook of Medicine, G-97 (1998), and MSG is the single sodium salt of glutamate, 11 McGraw-Hill Science and Technology Encyclopedia, 454 (8th ed.1997). Glutamate "serves as one of the body's excitatory neurotransmitters." 97 J.Am.Dietetic Ass'n. 793 (July 1, 1997) (1997 WL 9806406). Glutamate occurs in foods as either a free amino acid or bound as a constituent in proteins.[9] (Id.; R-3 at X001073.) *1292 "Free glutamate is readily available for use in the body, whereas bound glutamate becomes available to body tissues more slowly, as the intestines chemically break down foodstuffs." (Id.) Bound glutamate is unavailable for other biological activity. (Id. at X001051.) The chemical nature of free glutamate is the same regardless of its source. (Id. at X0010873.) L-glutamate is the predominant natural form of free glutamate and is the only form with flavor-enhancing activity. (Id. at X001073.) L-glutamic acid is the amino acid component of MSG. (R-3 at X000334.)
MSG is not a flavoring agent, but, like salt, brings out or enhances flavors. Science and Technology Encyclopedia at 454. MSG is a white, practically odorless crystalline powder similar in appearance to salt or sugar. (R-3 at X001071.) It was originally produced in the Orient from seaweed, and is now primarily produced from wheat gluten or from desugared beet molasses. Science and Technology Encyclopedia at 454. MSG has been available commercially in the United States since the 1940's. (R-3 at X000064.) The FDA originally considered MSG to be artificial flavoring and required it to declared as such in an ingredient list. (R-2 at 000034.) Its availability increased in the late 1940's, however, resulting in a corresponding increase in its use in foods. (Id.) In 1949, the FDA changed its policy to require that the presence of MSG be declared on the label by its common or usual name, monosodium glutamate, when it is "used as an ingredient in a food for which a standard of identity has not been promulgated under the Federal Food, Drug, and Cosmetic Act." (Id.)
MSG's principal use now is in the preparation of canned and dried soups, but it is also used in the production of some meat, vegetable, fruit, and fish products. Science and Technology Encyclopedia at 455. MSG is the most widely used flavor enhancer. (R-2 at 000034.) The average daily intake of MSG in the United States was reported in 1986 to be at least .3 to 1 gram per day, with 4 to 6 grams possibly being ingested with a highly seasoned meal. (R-3 at X000231.) Consumer complaints about adverse reactions to MSG led to evaluation of the use of MSG as a flavor enhancer and of the possibility that such use could adversely impact the structure or function of the nervous system. (Id. at X001052.)
In January 1973, the FDA published a notice of proposed rulemaking for the labeling of "flavor, spices, and food containing added flavor." (R-1 at W00007.) The FDA Commissioner proposed, inter alia, to "[a]ccurately define materials which may be considered flavors and spices" and "describe specific conditions under which nonflavor ingredients of manufactured flavors are and are not exempt from the requirement of specific label declaration in finished food." (Id. at W000010.) Comments were received from various companies, associations, educational organizations, and two individuals. (Id. at W000010-03.) The Commissioner then decided that because MSG was neither a spice nor a flavor, it must be declared by its common or usual name when it was used as an ingredient in food. (Id. at W000226, 238.) Various companies and associations objected to the Commissioner's decision; however, that portion of the decision pertinent to MSG was unchallenged and is currently codified at 21 C.F.R. § 101.22(h)(5).
Protein hydrolysates are sometimes used as substitutes for MSG. (R-2 at 000036.) The FDA has concluded that protein hydrolysates function as both flavorings and flavor enhancers. (Id. at 000036-37.) Thus, the FDA requires that any protein hydrolysate used in food must be declared in the ingredient list by its common or usual name, including the food source from which the ingredient was prepared, e.g., a protein hydrolysate derived from the milk protein casein would be identified as "hydrolyzed casein" rather than "protein hydrolysate." (Id. at 000037, 000040-41; 21 C.F.R. § 101.22(h)(7).) The FDA does not presently require that MSG be declared on the label of foods containing protein hydrolysates because it is a component of these ingredients and not an ingredient itself. (R-2 at 000043.)

Record Before the FDA
In 1978, the Life Sciences Research Office of the Federation of American Societies for Experimental Biology ("FASEB") reported on a study it had prepared for the FDA evaluating the health aspects of protein hydrolysates *1293 as food ingredients. (R-3 at X000108-160.) "Protein hydrolysates represent a group of acid or enzymatically treated protein sources designed to provide a mixture of amino acids or amino acids and small peptides. The major uses of these materials are as flavor enhancers and sources of `meatlike' flavor when added to foods." (Id. at X000113.) Protein hydrolysates contain free glutamate. (R-2 at 000025-26.) When sodium is added in the manufacture of protein hydrolysates, the glutamate fraction of the product is primarily MSG. (Id. at 25.)
The FASEB report included observations reported in a study by J.W. Olney[10] that young mice, rats, and rhesus monkeys had lesions in several areas of their brain after administration of doses of approximately 1 gram of MSG, aspartate, or cysteine per kilogram of body weight. (R-3 at X000144.) "Based on these observations, [Olney and his associates] have questioned the desirability of adding these substances to the human diet." (Id.)
The report also noted that other studies indicated as follows:
Two types of responses have been described following human ingestion of [MSG]. In the first, symptoms normally identified as allergic symptoms are experienced by individuals sensitive to the raw materials from which the glutamate is prepared, e.g., beets, corn or wheat. The second is [MSG Symptom Complex[11]], first reported in 1968. Apparently this syndrome appears in sensitive individuals within 5 to 35 minutes after consuming, on an empty stomach, foods containing on the order of several grams of added [MSG]. In order of frequency of appearance, the signs and symptoms include: a sensation of tightness in the back of the neck; a feeling of pressure behind the eyes; frontal or temporal headache; drowsiness, facial flushing, sweating, nausea, a feeling of pressure on the side of the face, thirst, pressure, and burning sensations in the chest; and abdominal pain. These manifestations are transient, usually lasting for less than 1 hour; however, headache may occasionally persist for as long as 5 hours. (Id. at X000080-81.)
Susceptibility to MSG Symptom Complex ("MSC") was reported to be greater in women than in men. (Id. at X000081.) No correlation was found between the effects and the blood levels of glutamate, and no evidence of "significant untoward consequences" were found to result among those individuals susceptible to MSC. (Id.)
The FASEB study concluded, in part, that: While no evidence in the available information on acid hydrolyzed proteins, enzymatically hydrolyzed proteins, and yeast autolyzates demonstrates a hazard to the public when they are used as flavoring agents at levels that are now current and the manner now practiced, uncertainties exist requiring that additional studies should be conducted. (Id. at X000148.)[12]
The FDA requested in 1979 that FASEB update its evaluation of the health aspects of glutamates as food ingredients. (Id. at X000167.) The FASEB issued its resulting report in 1980. (Id. at X000161.) Referring to its 1978 report, FASEB noted that the conclusions in that report were "based in part upon controversial experimental results which indicated neuronal damage in common laboratory animal species, particularly in neonates, following parenteral or oral administration of high doses of [MSG] in aqueous solution." (Id. at X000167.) FASEB could not reach a conclusion in its prior report as to the public health significance of MSC because "the frequency of occurrence of this syndrome in the population and its differential diagnosis were based upon controversial and largely anecdotal data." (Id.) The 1980 report summarized various studies on glutamate acid, including one by Olney, (id. at X000169-185), and noted:
Recently published information regarding the frequency of [MSC] in the general population has demonstrated the elusive qualities of the syndrome and a wide range *1294 of severity. However, the purview of the [FASEB] Select Committee extends only to the effects of glutamates as they are added to various processed foods sold to the public. (Id. at X000188.)
The FASEB further concluded, in part, that:
[T]he new information on long-term oral administration of [MSG] in the diet to various animal species has revealed no adverse effects, while data showing neuropathological lesions in neonatal animals resulting from subcutaneous or forced oral dosing of MSG has thus far been confirmed only in rodents....
Ingestion of [MSG] solutions has been demonstrated to cause transient clinical symptoms resembling those of [MSC] and there is evidence that some individuals may respond to relatively small doses. Similar symptoms can be evoked by certain other food substances. The use of MSG in restaurant-and/or-home-prepared foods does not fall within the purview of the Select Committee since it is limited in its considerations to the use of glutamates as ingredients in processed foods. According to industry sources, MSG is not added to infant and junior foods. Because, however, a proportion of the consuming public may be sensitive acute responders, even though the unpleasant symptoms are transient, the Select Committee believes there should be some constraint placed on the addition of MSG to processed foods.... (Id. at X000190.)
There is no evidence in the available information on L-glutamic acid ... monosodium L-glutamate ... that suggests reasonable grounds to suspect, a hazard to the public when they are used at the levels that are now current and in the manner now practiced. However, it is not possible to determine, without additional data, whether a significant increase in consumption would constitute a dietary hazard. (Id.)
In 1986, an Ad Hoc Advisory Committee on Hypersensitivity to Food Constituents was chartered to review and evaluate available information on adverse reactions in people to food constituents, including MSG, and to make recommendations to the FDA Commissioner. (Id. at X000220.) The Committee concluded in May that (1) there was no evidence that MSG was a significant health hazard to the general population; (2) there was some evidence that a small portion of the population had a self-limited, dose-dependent mild reaction to MSG; (3) a few cases of MSG-induced asthma and hives had been reported; and (4) labeling of MSG and surveillance of adverse reactions to MSG should be continued. (Id. at X000223.)
In 1992, the American Medical Association's Council on Scientific Affairs reported to the FDA that although (i) the "relative safety and potential for human harm" of MSG had been repeatedly evaluated, (ii) the public debate over that potential had escalated, and (iii) a "number of anecdotal accounts of negative personal experiences attributed to MSG [had] been reported," the "scientific record did not support the conclusion that MSG ... as either [an] exogenously-added flavor enhancing substance[] or [a] naturally-occurring component[] of food proteins pose[s] a significant public health hazard." (Id. at X000334-35.) Accordingly, the Council concluded, it recommended against a resolution advising the FDA to mandate the labeling of all foods containing added MSG. (Id. at X000338.)
The safety of MSG was again the subject of a FASEB report in 1992. (Id. at X000724-1045.) Animal studies were summarized, including those performed by Olney. (Id. at X000896-901.) In the studies on human consumption of MSG, the two most commonly used doses were 150mg/kg body weight and 34 mg/kg body weight. (Id. at X000902.) The former dosage was the acceptable daily intake ("ADI") as established by the World Health Organization ("WHO"); the latter was the concentration calculated to be above the 90th percentile of daily intake of MSG added to the diet. (Id.) One study reported that the severity of symptoms ranged from heartburn-gastric discomfort and light-headedness to pressure sensations, warmth and burning, tingling, and headache, with the former not being dependent upon the dosage and the latter occurring only beyond an unspecified threshold in a dose-dependent manner. (Id.) The report concluded, in part, that "[e]arly trials with large doses of MSG have consistently identified subgroups of responders, *1295 however, questions about challenge protocol and experimental methods and analysis continue to cloud this issue about safety of glutamate as a food additive." (Id. at X000905.)
In 1994, the citizens' petition was filed, citing, inter alia, the 1990 and 1992 FASEB reports. (Id. at X000001-19.) Attached to the petition were letters from various individuals describing their adverse reactions to MSG and urging the adoption of regulations mandating the disclosure of any MSG, and the amount of MSG, added to a food product. (Id. at X00031-56.)
In addition to the above-mentioned FASEB reports, the Ad Hoc Committee's report, and the Council's report, the FDA also reviewed a 1995 FASEB report analyzing adverse reactions to MSG and an evaluation of that report. (Id. at X000344-722.) The report noted that:
Based on scientifically verifiable evidence, there is a subgroup of presumably healthy individuals within the general population that respond with manifestations of the MSG symptom complex to an oral bolus[13] of MSG ≥ 3 g[.] in the absence of food. This response generally occurs within 1 hour of exposure. (Id. at X000478.)
The report further noted that there had been no scientifically verified evidence of adverse effects attributable to glutamate contained in hydrolyzed proteins. (Id.) "Nor is there scientifically verifiable evidence of adverse effects to most individuals exposed to MSG at several times the estimated ADI as established by the WHO/FAO (150 mg MSG/kg [body weight]/day)." (Id.) The report concluded, however, that despite limitations in number and design of available studies, that a small subset of individual with severe unstable asthma apparently responded to doses of 1.5 grams to 2.5 grams of MSG given in a "low-energy challenge, e.g., capsule, in the absence of a meal containing protein and carbohydrate." (Id. at X000478-79.) The report further concluded that there might be several circumstances when a preexisting condition could predispose an individual to a reaction from MSG, however, evidence to support any predisposing factor other than asthma was conjectural or circumstantial. (Id. at X000480.) The report noted that there had been no studies to test the hypotheses about predisposing factors. (Id.)
The evaluation of the 1995 FASEB report began by noting the lack of a scientific consensus about the occurrence, variety, and severity of reported adverse reactions associated with exposure to MSG. (Id. at X001051.) The evaluation further noted that:
In arriving at [the FASEB expert panel's] conclusion about the existence and nature of the MSG symptom complex, the Expert Panel focused on data that reported a positive association between adverse effects and MSG. This was a reasonable approach because lack of consistency in study design and subject selection criteria in the studies that they reviewed precluded a meaningful analysis of combined data. However, it is noteworthy that the results of human challenge testing have varied widely and the reproductibility of reported responses has been inconsistent. There have been only limited double-blind placebo-controlled tests of individuals who believed or were told by a health professional that they were MSG-sensitive, and this testing failed to confirm sensitivity to MSG.... (Id. at X001054.)
The Expert Panel identified two main constraints in determining the mechanism(s) that underlie the MSG symptom complex or other adverse effects that have been attributed to MSG. They are: (1) the lack of objective endpoints to measure following challenges to MSG, and (2) the lack of data relating the adverse effects that are reported to metabolic responses to oral MSG challenge. Neither changes in plasma glutamate levels nor other aspects of the biochemistry and physiology of glutamate have been clearly associated with adverse reactions to MSG.... (Id. at X001054-55.) We agree that the weight-of-evidence supports the conclusion of the Expert Panel regarding the existence of a MSG symptom complex which consists of adverse reactions previously described as components *1296 of a Chinese restaurant syndrome. In terms of actual conditions of use, the Expert Panel's basic finding of the occurrence of a MSG symptom complex in the absence of food is difficult to extrapolate reliably to "real world" exposures to MSG in foods. Exposure conditions of potential concern with respect to eliciting adverse responses that are part of the MSG symptom complex in some individuals are likely to occur when clear soups or broths containing relatively high levels of MSG are eaten on an empty stomach or when large amounts of MSG are used in food preparation. Given the limited testing of individuals with demonstrated MSG symptom complex responses, the extent to which glutamate consumed with food can elicit similar responses is unknown and further research is needed in this area. It is prudent to assume that some individuals will respond to MSG in some foods with significant caloric content. (Id. at X001056.)
The evaluation noted the opposition by individuals and groups to the use of MSG, and further noted the grounds for such opposition and the Expert Panel's consideration of those grounds and of the information submitted in support thereof before the Panel concluded that the allegations were anecdotal in nature and not supported by scientifically valid evidence. (Id. at X001058.) At the end of the 18-page evaluation, the Director of the Division of Health Effects Evaluation concluded that "[t]he likelihood that typical food uses of MSG would perturb or modify neuroendocrine status is speculative. The potential of food uses of MSG to evoke adverse reactions warrants further investigation." (Id. at X001068.) The last paragraph of the evaluation reads as follows:
Overall we interpret the findings of the [FASEB] report to be generally consistent with the safety assessments of other authoritative organizations that have affirmed the safety of MSG at normally consumed levels for the general population. We concur with it conclusion that there is no evidence linking current MSG use to any serious, long-term medical problems in the general population. (Id.)
When denying the citizen's petition, the FDA's Associate Commissioner for Regulatory Affairs listed several incorrect or unsupported assertions he found in the petition, including that (i) the common or usual name of all food ingredients that contain free glutamate was "MSG" and (ii) manufactured glutamate, e.g., MSG, and free glutamate, e.g., glutamate found in tomatoes, functioned differently. (Id. at X001087-92.) These erroneous assertions led to a proposed inaccurate warning, the Associate Commissioner concluded. The FDA found, however, that there was, based on the 1995 FASEB report, a subgroup of "otherwise healthy individuals that may suffer adverse effects following ingestion of 3 or more grams of MSG in the absence of food." (Id. at X001093.) Accordingly, the Associate Commissioner suggested that the interested persons who had filed the petition comment on a proposed rule. (Id. at 1094.)
In addition to the foregoing reports and information submitted to the FDA relevant to 21 C.F.R. § 101.22(h)(5) and the citizens' petition, the FDA had before it an extensive record of comments and testimony relevant to the regulation governing the identification of protein hydrolysates on food labels.[14] In May 1991, the FDA concluded, in pertinent part:
The [FDA's] review revealed that in spite of a large amount of information regarding hypersensitivity reactions to [MSG], the extent of the problem remains unknown because of a lack of reliable information regarding the prevalence or incidence of reactions in the general population. Most of the adverse reaction reports that the [FDA] has obtained consist of anecdotal information that a person had a reaction after eating a certain food. Although such information may be of value in providing direction for further studies, it does not provide the basis for any definitive determinations about the effects of [MSG]. While the agency believes that there is some evidence in case reports and in the scientific literature that dose dependent, mild reactions to [MSG] occur in a small *1297 portion of the population, FDA is not aware of any scientific evidence that establishes that [MSG] causes particularly severe reactions, or that reactions to low doses of [MSG] occur and are life-threatening. (Id. at 000044-45.)
On September 12, 1996, the FDA published a notice of proposed rulemaking relating to MSG. (R-3 at X001070-78.) After outlining the previous safety reviews and the 1995 FASEB report, the FDA invited comment on whether additional labeling requirements should be established to protect glutamate-sensitive consumers and the contents of any such additional requirements. (Id. at X001075-76.)

Discussion
Donna Shalala, Secretary of the United States Department of Health and Human Services, and David A. Kessler, Commissioner of the United States Food and Drug Administration (hereinafter collectively referred to as "Defendants") argue that they are entitled to summary judgment for two primary reasons. First, 21 C.F.R. §§ 101.22(h)(7) and 102.22 are neither arbitrary, capricious, nor violative of 21 U.S.C. §§ 321(n) and 343(a). Defendants specifically argue that the two regulations were promulgated after the FDA reviewed the available scientific information, including one study that reviewed several articles advocating Plaintiffs' position and found those articles lacking any support by "well-conducted, controlled, scientific studies," and that the conclusions drawn by the FDA after its review are entitled to substantial deference. Moreover, § 101.22(h)(5) is consistent with 21 U.S.C. § 343(i)(2) and is rational, and the present proceedings to possibly change the disclosure requirements on free glutamate do not render the present regulations, arbitrary, capricious, or irrational. Second, Defendants further argue, the FDA did not act arbitrarily or capriciously in denying the citizens' petition because the petition (a) relied on several incorrect or unsupported assertions, e.g., that manufactured or processed foods that contain free glutamate are different from foods that contain naturally-occurring free glutamate and should be regulated differently; (b) advocated a approach that was inconsistent with the principles established in 21 C.F.R. § 102.5(a) requiring the use of common or usual names and with 21 U.S.C. §§ 343(a)(1), (b), and (i); (c) advocated a warning statement[15] that was scientifically inappropriate.
Plaintiffs counter in their motion for summary judgment that (1) the FDA's regulations on MSG are arbitrary and capricious because (a) all MSG is functionally equivalent, regardless of whether the MSG is a separate ingredient or is a component of a hydrolyzed protein; (b) the regulations are inconsistent with the FDA's regulation prohibiting a claim "No MSG" or "No MSG Added" from being included on a food label if MSG is indeed present, regardless whether it was added as a single ingredient or was a component of another ingredient; (c) the lack of a required disclosure that MSG is present when it is, regardless of what form it is present in, is misleading and violates the fundamental purpose of the Food, Drug, and Cosmetic Act to inform and protect the public with respect to foods and drugs; (2) the FDA's MSG regulations mislead the public and therefore facilitates misbranding; (3) the FDA's denial of the citizens' petition is fatally premised upon incorrect statements of the petition's goals; and (4) the FDA's MSG regulations are arbitrary and capricious also because the FDA ignored relevant information, i.e., the inclusion of flavor enhancers as a chemical hazard in the 1993 and 1995 Food Codes, Dr. Olney's 1991 letter to Dr. Kessler, and evidence linking MSG and migraine headaches.
Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of material fact is genuine if it has a real basis *1298 in the record; and, a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir.1992) (citations omitted).
The initial burden is on the moving party to clearly establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. See City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir.1988). After the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the non-moving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All disputed facts are to be resolved, and all inferences are to be drawn, in favor of the non-moving party. See Kopp v. Samaritan Health System, Inc., 13 F.3d 264, 269 (8th Cir.1993). "Summary judgment is an appropriate procedure in cases arising under the Federal Food and Drug Act [21 U.S.C. § 343]." United States v. Article of Food ... "Manischewitz ... Diet Thins", 377 F.Supp. 746, 748 (E.D.N.Y. 1974).
The parties' dispute focuses on the regulations, primarily 21 C.F.R. § 101.22(h)(5), and on the denial of the citizens' petition.

Arbitrary and Capricious
Plaintiffs argue that the FDA's MSG regulations are arbitrary and capricious, in addition to being misleading.
Title 5 U.S.C. § 706(2)(A) permits an agency's action to be set aside only upon a showing that the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." "An arbitrary and capricious decision exists where an agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Von Eye v. United States, 92 F.3d 681, 685 (8th Cir. 1996) (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). See also Downer v. U.S. By and Through U.S. Dept. of Agriculture and Soil Conservation Serv., 97 F.3d 999, 1002 (8th Cir.1996) (holding to same effect). This deferential standard of review requires an independent review of the same administrative record that was before the agency, see Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), and is particularly appropriate when the agency decision under review involves an agency's own regulations and is of matters within its area of expertise, see Mausolf v. Babbitt, 125 F.3d 661, 667 (8th Cir.1997). "Regulations promulgated by an agency [are to be] upheld if they are `reasonably related to the purposes of the enabling legislation.'" Id. (quoting Voyageurs Region Nat'l Park Ass'n v. Lujan, 966 F.2d 424, 427 (8th Cir. 1992)). Additionally, the rationale for deference is particularly strong when an agency's action involves the evaluation of scientific data within its technical expertise. See Marsh, 490 U.S. at 377; International Fabricare Inst. v. E.P.A., 297 U.S.App.D.C. 331, 336, 972 F.2d 384, 389 (1992). See also Baltimore Gas and Electric Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (court reviewing agency action must generally be at most deferential when action is scientific determination within agency's area of special expertise). A court may not simply substitute its views for that of the agency. See Western Nebraska Resources Council v. E.P.A., 943 F.2d 867, 870-71 (8th Cir. 1991). Moreover, "[t]he agency review is like a trial in a district court: it is supposed to be the main event." Stauber v. Shalala, 895 F.Supp. 1178, 1190 (W.D.Wis.1995).
The mandate of FDA includes directions to "promulgate regulations fixing and establishing for any food, under its common or usual name so far as practicable, a reasonable definition and standard of identity, a reasonable standard of quality, and/or reasonable standards of fill of container... In prescribing a definition and standard of identity for any *1299 food or class of food in which optional ingredients are permitted, the Secretary [of Health, Education, and Welfare] shall, for the purpose of promoting honesty and fair dealing in the interest of consumers, designate the optional ingredients which shall be named on the label." 21 U.S.C. § 341. An administrative agency has broad discretion in carrying out its mandate. See Mausolf, 125 F.3d at 667.
The parties disagree about whether the current regulations on MSG and protein hydrolysates are arbitrary and capricious. The nature of the parties's dispute is illustrative of the wisdom of the particularly strong deferential standard of review that a court must employ when reviewing an agency's regulations on a subject within the agency's area of expertise and requiring an evaluation of scientific data within that expertise. In reviewing a FDA regulation approving the use of aspartate, an artificial sweetener, in liquid form, the United States Court of Appeals for the District of Columbia Circuit observed that "[t]he judiciary is ill-equipped to conduct investigations and analyze facts of the type involved in this case." Community Nutrition Inst. v. Young, 249 U.S.App.D.C. 150, 157, 773 F.2d 1356, 1363 (1985).
The 24-volume administrative record before the Court includes comments and testimony by several of the Plaintiffs about the harmful effects of MSG and includes at least six reports detailing studies on the effects of MSG. The majority of these reports cite work by Dr. Olney. There is evidence in the record, however, that MSG is not harmful to consumers, with the exception of consumers who are susceptible to MSCa complex involving transient physiological reactions to the consumption within the past 30 minutes of MSG. There is also evidence in the record that a label requiring that any free glutamate present in a manufactured or processed food be identified as "MSG", see page 1291, supra, would not be accurate. Plaintiffs attempt to minimize this inaccuracy by describing it as technical only and by reiterating their position that the consumption of MSG can lead to significant physiological harm to certain consumers. In order for the Court to concur with Plaintiffs' characterization of this inaccuracy the Court would have to assume a scientific expertise that is for the FDA to exercise, not the judiciary. Moreover, there is nothing in the record to suggest that the FDA overlooked evidence pertaining to MSG consumption. Much of the evidence relied upon by Plaintiffs has been characterized by the FASEB reports as anecdotal. Plaintiffs clearly disagree with this characterization, yet it is not for the Court to decide which scientific analysis of the various studies on human consumption of MSG should prevail. Mere differences in the weight or credence given to particular scientific studies are an insufficient basis upon which to overrule an agency's decision on a matter within its expertise. See Young, 249 U.S.App.D.C. at 157, 773 F.2d at 1363.

Misbranding and Misleading Regulations
Title 21 U.S.C. § 343(i)(2) and the FDA do not require MSG to be separately disclosed on a food label when it is a component of another ingredient, e.g., a protein hydrolysate. Title 21 U.S.C. §§ 343(a)(1) and 321(n) would require such a disclosure if the failure to do so would be misleading. A technically accurate description of a food may nevertheless violate 21 U.S.C. § 343 if the description is misleading in other respects. See United States v. An Article of Food Labeled Nuclomin, 482 F.2d 581, 584 (8th Cir.1973).
Plaintiffs argue that the omission at issue is misbranding, in violation of § 343(i)(2),[16] and misleading, in violation of § 321(n).[17] They list in their complaint 37 ingredients containing MSG which must be identified on labels by the ingredient's name but which need not disclose the amount of MSG present in that ingredient. (Comp. at ¶ 41.) Defendants counter that the FDA's regulations on the labeling of MSG are neither arbitrary nor capricious, but are rational and in compliance with the statutory mandate of § 343(i)(2).
*1300 Plaintiffs call upon the Court to analyze scientific data[18] in order to determine whether an FDA regulation is misleading or misbranding because it does not mandate that MSG be disclosed when it is a component of another ingredient. As noted above, the judiciary is ill-equipped to engage in this type of analysis, and does so only under the three-layered deferential standard of reviewdeference owed to (1) an agency's action within its mandate (2) interpreting its own regulations and (3) within its area of scientific expertise.
The Court's examination of the record and discloses that the FDA fully considered each of the arguments posed by Plaintiffs as to why the FDA should require the disclosure of MSG regardless of how it is comes to be in a food product and found them not to lack compelling scientific support. See Henley v. Food and Drug Admin., 873 F.Supp. 776, 784 (E.D.N.Y.1995) (important consideration in reviewing FDA's denial of citizens' petition advocating particular warning on oral contraceptives' labels was that the notice and comment rulemaking by the FDA addressed the specific issues raised by petitioners), aff'd, 77 F.3d 616 (2d Cir.1996). The Court finds there to be substantial evidence to support that finding. Moreover, that finding compels a conclusion that the present regulations neither mislead nor misbrand within the meaning of the statutes. "The function of the court [is] merely to determine whether the existing label is misleading, not to tell the [FDA] what amendments may be appropriate in order to rectify the situation." Manischewitz, 377 F.Supp. at 749. See also United States v. An Article of Device...27 Diapulse, 650 F.2d 908, 910 (7th Cir.1981) (if item is mislabeled, the legality of new labeling is for the administrative agency to determine because courts are not experts on the scientific issues involved in accurate labeling).

Denial of Citizens' Petition; New Evidence
Plaintiffs further argue in their motion for summary judgment that the FDA's denial of the citizens' petition rests on misstatements and that the FDA's denial is arbitrary and capricious because it ignored pertinent information. Plaintiffs attach this information to their motion as an appendix.
The Court first notes that Plaintiffs have not amended their complaint to raise the issue of whether the FDA acted arbitrarily and capriciously in denying the citizens' petition. However, this claim necessarily involves issues raised in the instant complaint and, for the reasons set forth above, are unavailing.
Plaintiffs include as support for their argument several documents not included in the administrative record. A reviewing court may consider evidence that would explain the process an agency used in reaching its determination but may not consider evidence that was never submitted to the agency that is relevant to the merits of the underlying dispute. See Stauber, 895 F.Supp. at 1190. The Court has reviewed the evidence submitted in Plaintiffs' appendix and finds the evidence to be either irrelevant, e.g., correspondence from the FDA regarding specific food labels, or redundant, e.g., correspondence from Dr. Olney.

Conclusion
The Court has reviewed the extensive administrative record before it on the challenged actions of the FDA and the arguments of the parties. The Court finds that the FDA did not act arbitrarily or capriciously, specifically the FDA did not rely on irrelevant factors, did not ignore any important aspect of human consumption of MSG, and did not fail to offer a rational explanation for its actions.
Accordingly, for the reasons set forth above,
IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED [Doc. 64] and Plaintiffs' Motion for Summary Judgment is DENIED [Doc. 69].
IT IS FURTHER ORDERED that a separate judgment shall be entered in favor of *1301 Defendants and against Plaintiffs in the instant cause of action.
NOTES
[1] The parties have consented to the undersigned United States Magistrate Judge entering a final disposition in this case. See 28 U.S.C. § 636(c).
[2] Title 21 C.F.R. § 101.22(h)(5) requires that:

(h) The label of a food to which flavor is added shall declare the flavor in the statement of ingredients in the following way:
(5) Any monosodium glutamate used as an ingredient in food shall be declared by its common or usual name "monosodium glutamate."
[3] The administrative record before the Court includes (1) the two-volume record for the proposed rule later codified at 21 C.F.R. § 101.22(h)(5); (2) the twenty-volume record for the proposed rules later codified at 21 C.F.R. §§ 101.22(h)(7) and 102.22; and (3) the two-volume record for the citizen's petition. The administrative record will be cited as R-[no.], with the number in brackets signifying which of the three groups of records is being cited.
[4] Title 21 C.F.R. § 101.22(h)(7) provides as follows.

Because protein hydrolysates function in foods as both flavorings and flavor enhancers, no protein hydrolysates used in food for its effects on flavor may be declared simply as "flavor," "natural flavor," or "flavoring." The ingredient shall be declared by its specific common or usual name as provided in § 102.22 of this chapter.
[5] The individual plaintiffs are Jack L. Samuels; Adrienne Samuels, Ph.D.; John W. Olney, M.D.; Francis J. Waickman, M.D.; John R. Hain, M.D.; L. Jack Kirkham, M.D., M.P.H.; Ian Murphy, M.D.; Michael Parks, M.D.; Kathy B. Porter, M.D.; Bruce Chrisman, M.D.; Gerard Guillory, M.D.; Toni Weil; Mary Susan Bowers; Robert Tucker; Mary Ann Conley; Richard Castic; Julie A. Brown; Linda Roberts; Stephen Roberts; Barbara Bredemeier; Ruth K. Gross, R.N.; Sherrie Mustari; Elizabeth Concannon; Pat Holland; Ron Holland; Connie Burgess; Lila Reece-Williams; George Bucic; Lynn Wegener; and Joseph Wegener.
[6] Title 21 U.S.C. § 321(n) provides that:

If an article is alleged to be misbranded because the labeling or advertising is misleading, then in determining whether the labeling or advertising is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling or advertising relates under the conditions of use prescribed in the labeling or advertising thereof or under such conditions of use as are customary or usual.
[7] Title 21 U.S.C. § 343 provides, in relevant part, that a food is deemed to be misbranded if its labeling is false or misleading.
[8] A third count alleging that Plaintiffs had a First Amendment right to the disclosure of all relevant information about MSG was earlier dismissed.
[9] Foods high in protein, for example, meat and dairy products, may have high levels of bound glutamate; however, bound glutamate is not considered to be closely associated with adverse effects. See 97 J.Am.Dietetic Ass'n. 793 (July 1, 1997) (1997 WL 9806406).
[10] John W. Olney, M.D., is a plaintiff in the instant action.
[11] This Complex was formerly known as "Chinese Restaurant Syndrome."
[12] The report also noted that protein hydrolysates were not being added to commercially prepared infant or junior foods as flavoring agents. (R-3 at X000148.)
[13] A bolus is defined as a(i) single, relatively large quantity of a substance or (ii) a masticated morsel of food or another substance ready to be swallowed. Stedman's Medical Dictionary, 220 (26th ed.1995).
[14] Six of the individual plaintiffs in this action either submitted comments to, or testified before, the FDA about the necessity of identifying MSG as a component of a protein hydrolysate.
[15] The suggested warning statement read as follows:

CAUTION: THIS PRODUCT CONTAINS [MSG] AND MAY ADVERSELY AFFECT PREGNANT WOMEN, INFANTS, CHILDREN, WOMEN OF CHILD BEARING AGE, AND INDIVIDUALS WITH AFFECTIVE (MOOD) DISORDERS.
[16] Title 21 U.S.C. § 343(i)(2) provides that a food that is fabricated from two or more ingredients is misbranded unless its label bears the common or usual name of each such ingredient, "except that spices, flavorings, and colorings, other than those sold as such, may be designated as spices, flavorings, and colorings without naming such."
[17] See note 6, supra.
[18] Plaintiffs continually characterize their factual allegations as "undisputed facts." The Court finds that this characterization is sometimes inaccurate, and, as such, is itself misleading.